IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HENRI L. SONTAG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-135-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Henri L. Sontag ("Sontag"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Sontag appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Sontag was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Sontag was 53 years old at the time of the hearing before the ALJ on September 9, 2008. (R. 23, 29). Sontag was a high school graduate, and she had been a licensed beautician. (R. 30). Sontag testified that she last worked in 2003 or 2004, and she had taken a leave of absence due to surgery. (R. 30-31). She returned to work after the surgery, but found that she had too many absences due to multiple medical conditions, and therefore she quit work. (R. 30-32).

One of the primary reasons why she quit work was problems with her hands and feet involving numbness, tingling, and pain that she described as throbbing, and those conditions had continued until the hearing. (R. 32-33). She had those sensations daily, but medication helped calm the symptoms down. (R. 33). Trying to use her hands would make it worse, and she sometimes dropped objects with no warning. *Id.*

Sontag had experienced two or three episodes involving her heart before she quit work, but those episodes were not heart attacks, and she had not had any more since quitting work. (R. 34). She had experienced childhood asthma that did not bother her again until after the surgery. (R. 34-35). The renewed asthma started out as mild, but increased in severity with her exposure to chemicals in her work as a hairdresser. (R. 35). Temperature changes did not affect her asthma much, but stress could cause her to have several asthma attacks a day. *Id.* She knew that her smoking had made her asthma worse, and she had quit smoking two months before the hearing. (R. 36). Sontag could climb stairs, but she would be very out of breath. *Id.* She could walk about fifteen minutes in a store, but then she would need to sit down and rest. *Id.* If the line was short at Wal-Mart, she could walk the entire time. (R. 37). She could stand to do dishes for two people, about 25-30 minutes, but then she would need to sit down and rest for a few minutes. (R. 37-38).

During the day, she tried to force herself to do things. (R. 36-37). She changed positions constantly, sitting, walking, or lying down, due to pain and numbness. *Id.* Sontag said that on a really bad day, which happened about two or three times a week, she could not get out of bed. *Id.*

In addition to numbness in her right hand, she also had tremors that had started intermittently about six months before the hearing, and were continuous at the time of the hearing. (R. 37).

She had balance problems that made it difficult for her to return to an upright position after squatting, bending, or kneeling. (R. 38). She assumed her balance problems were due to numbness. *Id.* She could not lift the laundry basket to take it to the laundry room, so her husband did it. *Id.* Her husband also did the mopping and overhead dusting, and sometimes she could do the low dusting. (R. 38-39).

She attended church on Sunday mornings, but she would miss if she was in too much pain, which might happen one or two Sundays a month, especially if she had exerted herself too much. (R. 39).

She sometimes got blurry vision, and she limited her driving for that reason. (R. 40). Driving 20 minutes to her daughter's house was about as far as she would drive, if she was having a good day. *Id.*

She had experienced depression, and she believed it was due to her many problems and her inability to do things she used to do, such as running her own business, being active in church, singing in church, and teaching Sunday School. *Id.* She sometimes wished she were dead, and she had constant feelings of being a burden to her family. (R. 42). With medications, her depression was not as bad, and instead of feeling as though she were in a black hole, she

3

could see some light.  *Id.*  She could not remember what she read as well as she had previously, and on a bad day, she said she was "in a haze." (R. 41).  Her medications caused side effects such as dizziness, lightheadedness, fatigue, and sleepiness.  *Id.*

Records show that Sontag was treated by Nicholaas M. Grobler, M.D. for routine medical care from 2002 through 2004. (R. 242-82).  On April 30, 2002, Sontag weighed 221 pounds. (R. 243).  On October 1, 2002, she was assessed with diabetes, and she was given prescriptions for multiple medications. (R. 246).  On September 24, 2003, it appears that assessments included diabetes, peripheral artery disease, peripheral vascular disease, post menopausal syndrome, increased weight, and hypertension. (R. 250).  On September 29, 2003, chest discomfort with shortness of breath was noted. (R. 251).  Hyperlipidemia was added to Sontag's previous assessments.  *Id.*  On October 9, 2003, Sontag was crying, and Dr. Grobler added anxiety, depression, early degenerative joint disease and osteoarthritis, and neuropathy to his assessments. (R. 252).  Additional records from 2003 and 2004 reflect continuing symptoms, along with various pains, cluster headaches, and bronchitis. (R. 253-70).

Records show that Sontag was treated for heart-related procedures at San Antonio Community Hospital in Upland California in 2003 and 2004. (R. 201-41).  She was hospitalized from June 4-7, 2004. (R. 208-41).  A discharge summary stated her discharge diagnoses as chest discomfort, history of coronary artery disease status post angiogram in September 2003, arteriosclerotic heart disease, and hypercholesterolemia, with no evidence of irreversible ischemia. (R. 209).

4

Sontag established care with Michael C. Gietzen, D.O. on March 11, 2005. (R. 287). Dr. Gietzen's assessments were hypertension, non-insulin dependent diabetes, and hyperlipidemia. *Id.* She was seen again in March and June, 2005, and on December 27, 2005, Dr. Gietzen said that Sontag had not been taking most of her medications due to financial reasons. (R. 285-86). Sontag reported that she was going to receive assistance from the health department. (R. 285).

Sontag next saw Dr. Gietzen on June 10, 2006, and assessments were diabetes, hyperlipidemia, hypertension, and peripheral neuropathy, and she was seen for follow up on August 19, 2006 and September 13, 2006. (R. 284, 325). On October 3, 2006, Sontag reported increased symptoms of depression, and Dr. Gietzen was concerned that Sontag's blood sugar levels had been greater than 200. (R. 324). Dr. Gietzen's assessments were non-insulin dependent diabetes mellitus with poor control and depression, and he adjusted Sontag's medications. *Id.*

On February 13, 2007, Dr. Gietzen noted that Sontag's blood sugar levels were under better control. (R. 358). On February 21, 2007, Dr. Gietzen discussed smoking with Sontag, and Sontag said that she wanted to quit on her own. *Id.* Dr. Gietzen's assessments were non-insulin dependent diabetes, hypertension, upper respiratory infection, asthma, and tobacco dependence. *Id.* On June 11, 2007, Sontag presented with a foot lesion, which Dr. Gietzen stated appeared to be a wart, but he wanted a podiatrist to evaluate it due to Sontag's diabetes and peripheral neuropathy. (R. 357). Her blood sugar levels had been running over 200. *Id.* Dr. Gietzen discussed increasing her exercise. *Id.* Assessments were left foot lesion with diabetic peripheral neuropathy, non-insulin dependent diabetes with elevated blood sugar, and mild cellulitis of left foot secondary to diabetic lesion. *Id.* He referred Sontag to a podiatrist. *Id.* On November 6, 2007, Sontag presented to Dr. Gietzen with wrist pain resulting from a fall, and she also

discussed smoking cessation. (R. 356).

On August 5, 2008, Dr. Gietzen examined Sontag and noted "no sensation intact to 10 gram monofilament to all pressure points in her feet." (R. 355). Assessments were hyperlipidemia, hypertension, non-insulin dependent diabetes, asthma, back pain, and peripheral neuropathy. *Id.*

On September 8, 2008, Dr. Gietzen noted that Sontag had developed a tremor in her right hand two weeks earlier. (R. 376). He also noted that Sontag still smoked and that she said she would quit on her own. *Id.* Assessments were new onset tremor, high risk medications, hyperlipidemia, hypertension, non-insulin dependent diabetes, left ventricular hypertrophy, thyroid mass, tobacco dependence, and pulmonary hypertension. *Id.* Dr. Gietzen referred Sontag for a neurology evaluation and for further testing regarding her thyroid. *Id.*

On September 11, 2008, Dr. Gietzen wrote a letter "To Whom It May Concern" stating that Sontag had diabetic peripheral neuropathy symptoms in her upper and lower extremities. (R. 371). He stated that Sontag's neuropathy limited her to occasional use of her hands, with difficulty grasping, handling, and fingering. *Id.* Dr. Gietzen stated that Sontag would not be able to stand for extended periods of time and would need to have the ability to sit, stand, or lie down at will. *Id.*

On September 24, 2008, David M. Reinecke, M.D. wrote to Dr. Gietzen that Sontag needed a work up of suspected glaucoma. (R. 404). He found no background diabetic retinopathy, and he stated that choroidal nevus was stable. *Id.*

Jay K. Johnson, D.O., performed a neurological evaluation of Sontag on September 25, 2008. (R. 399-403). His conclusion was that the numbness of her hand was likely caused by carpal tunnel syndrome of the right side. (R. 401).

On September 30, 2008, Dr. Gietzen summarized the findings of Dr. Johnson, who believed that Sontag's tremor was due to carpal tunnel. (R. 375). Dr. Gietzen instructed Sontag to wear her wrist splints 24-hours a day. *Id.* Assessments were bilateral carpal tunnel syndrome, multimodular goiter, high risk medication, hyperlipidemia, and non-insulin dependent diabetes. *Id.*

Sontag's thyroid growths were evaluated by a physician who saw Sontag on December 24, 2008 and concluded that there was a low probability that the growths were cancerous. (R. 406-10).

Sontag was next seen by Dr. Gietzen, who noted the lapse of time between appointments, on November 30, 2009. (R. 378). Sontag said the lapse was due to financial issues. *Id.* Dr. Gietzen discussed Sontag's continued smoking with her, and she said she was trying to cut down. *Id.* On examination, Dr. Gietzen said that she had diminished sensation, with very slight sensation in her toes. *Id.* Assessments were non-insulin dependent diabetes, hyperlipidemia, hypertension, multinodular goiter, tobacco dependence, bilateral carpal tunnel syndrome, and diabetic peripheral neuropathy. *Id.* On January 14, 2010, Sontag's lipids were elevated, and Dr. Gietzen discussed insulin with her. (R. 379). She said that she would watch her diet better. *Id.* Assessments were hyperlipidemia, hypertension, and non-insulin dependent diabetes. *Id.* She was checked again on February 17, 2010 due to cough symptoms. (R. 380).

Agency consultant Tracy Carney, D.O. performed a physical evaluation of Sontag on August 26, 2006. (R. 300-14). On examination, Dr. Carney noted that sensory exam to light touch was intact for both of Sontag's feet. (R. 302). All of her examined joints had functional range of motion with no tenderness. *Id.* Sontag walked with normal speed and good balance with no assistive devices. *Id.* Her heel/toe walking was weak due to pain. *Id.*

Nonexamining agency consultant David Bissell, M.D. completed a Physical Residual Functional Capacity Assessment on August 28, 2006. (R. 315-22). Dr. Bissell found that Sontag had the exertional capacity to perform medium work. (R. 316). For narrative explanation, Dr. Bissell stated that Dr. Carney's examination did not indicate a disabling impairment. *Id.* Dr. Bissell found no other established limitations. (R. 317-22).

Agency consultant Denise LaGrand, Psy.D., completed a mental status examination of Sontag on March 7, 2007. (R. 329-35). Dr. LaGrand diagnosed Sontag on Axis I[1] with major depressive disorder, moderate. (R. 333). She assessed Sontag's global assessment of functioning ("GAF")[2] as 55. *Id.* Dr. LaGrand stated that Sontag's ability to maintain appearance, deal with the public, and function independently was good. *Id.* Her IQ, her memory skills, and her ability to concentrate appeared average. *Id.* Her ability to perform adequately in most job situations, handle the stress of a work setting, and deal with supervisors or co-workers was estimated to be low average. (R. 334).

Agency nonexamining consultant Ron Smallwood, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment dated April 11,

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

2007. (R. (R. 336-53). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Smallwood noted Sontag's symptoms of depressive syndrome. (R. 343). For the "Paragraph B Criteria,"[3] Dr. Smallwood found that Sontag had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 350). In the "Consultant's Notes" portion of the form, Dr. Smallwood briefly summarized Sontag's psychological complaints and Dr. LaGrand's evaluation. (R. 352).

On the Mental Residual Functional Capacity Assessment, Dr. Smallwood found that Sontag was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 336). He also found that Sontag was markedly limited in her ability to interact appropriately with the general public. (R. 337). Dr. Smallwood said that Sontag could perform simple work activity with routine supervision, she was able to relate to supervisors and co-workers for work purposes, and she could relate to the general public on a superficial basis. (R. 338).

## Procedural History

Sontag filed an application on August 10, 2007 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.* (R. 108-09). Sontag alleged onset of disability as of September 1, 2003. (R. 108). The application was denied initially and on reconsideration. (R.

---

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

64-67, 73-75). A hearing before ALJ Richard J. Kallsnick was held September 9, 2008 in Tulsa, Oklahoma. (R. 23-49). By decision dated October 1, 2008, the ALJ found that Sontag was not disabled. (R. 15-22). On January 5, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Sontag met insured status through December 31, 2008.  (R. 17).  At Step One, the ALJ found that Sontag had not engaged in any substantial gainful activity since her amended alleged onset date of March 7, 2007. *Id*.  At Step Two, the ALJ found that Sontag had severe impairments of major depressive disorder and diabetic neuropathy. *Id.*  At Step Three, the ALJ found that Sontag's impairments did not meet a Listing.  (R. 17-18).

The ALJ determined that Sontag had the RFC to perform light work.  (R. 18).  He stated that Sontag was "able to perform simple work activities, relate to co-workers, and interact with the general public on a superficial basis.  She is able to adapt to work situations." *Id.*  At Step Four, the ALJ found that Sontag was not able to perform any past relevant work.  (R. 21).  At

Step Five, the ALJ found that there were a significant number of jobs in the national economy that Sontag could perform, taking into account her age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Sontag was not disabled at any time from March 7, 2007 through the date of his decision. (R. 22).

## Review

Sontag makes three arguments that the ALJ's decision should be reversed, with the first and second arguments relating to Step Five and medical opinion evidence. The Court agrees with Sontag's third argument and finds that the ALJ's decision must be reversed because it did not give sufficient reasons for finding Sontag less than fully credible. Because reversal is required due to errors in the ALJ's credibility assessment, the other issues raised by Sontag are not addressed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

This reviewer has been unable to find any discussion of Sontag's credibility that approaches the required standard of specific reasons closely linked to substantial evidence. The only language addressing credibility is a boilerplate provision that Sontag's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons

explained below." (R. 20). The undersigned did not discover any "reasons explained below." Instead, after the boilerplate provision, the ALJ summarized Dr. LaGrand's evaluation, and then explained why he discounted Dr. Gietzen's opinion evidence. (R. 20-21). The ALJ's discussion of medical evidence did not address Sontag's credibility, and there was no other discussion of her credibility in the ALJ's decision.

The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Id. See also Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012) (opinion authored by Judge Posner criticizing Social Security Administration's use of "templates" in ALJ disability decisions).

The Commissioner cites to *Arles v. Astrue*, 438 Fed. Appx. 735, 738-39 (10th Cir. 2011) (unpublished), but *Arles* stands for the principle that while boilerplate language is disfavored, it is only insufficient in the absence of a more thorough analysis. *See also Qualls v. Astrue*, 428 Fed. Appx. 841, 847-48 (10th Cir. 2011) (unpublished) ("despite the ALJ's use of disfavored language, his ultimate credibility determination is grounded in a thorough analysis"). Here there was no more thorough analysis that followed the ALJ's use of boilerplate language, and the lack of that analysis requires reversal. *Hardman*, 362 F.3d at 678-81.

While there may have been sufficient reasons with supporting evidence that could justify an adverse credibility determination, the undersigned finds that the Court cannot make that determination without impermissibly substituting its judgment for that of the ALJ. *Peeper v.*

*Astrue*, 418 Fed. Appx. 760, 766 (10th Cir. 2011) (unpublished), *citing Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004).  On remand, the ALJ should make a thorough analysis of Sontag's subjective complaints, including a discussion of the factors listed in 20 C.F.R. § 404.1529(c).  *Sitsler v. Astrue*, 410 Fed. Appx. 112, 117 (10th Cir. 2011) (unpublished); *Hamby v. Astrue*, 260 Fed. Appx. 108, 113 (10th Cir. 2008) (unpublished).

Because the errors of the ALJ related to the credibility assessment require reversal, the undersigned does not address the remaining contentions of Sontag.  On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Sontag.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.  *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 15th day of August, 2012.

_____
Paul J. Cleary
United States Magistrate Judge